UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HARVEY L. PATTERSON, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | Civil Action No. 02-2213 (ESH) | |
| ) | | |
| STEPHEN L. JOHNSON, ) | | |
| Administrator, ) | | |
| Environmental Protection Agency, ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |

**MEMORANDUM OPINION**

Plaintiff was employed at the Environmental Protection Agency ("EPA") from 1976 until his retirement in 2004. He claims that his former employer violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by discriminating against him on the basis of his race and then retaliating against him when he complained about this discrimination. Defendant has moved for summary judgment.[1] A previous motion for summary judgment was denied in order to allow plaintiff a reasonable opportunity to develop evidentiary support for his complaint. *See Patterson v. Whitman*, Civ. No. 02-2213, slip op. (D.D.C. June 9, 2003). Plaintiff has

---

[1] Also before the Court is defendant's Motion for Leave to File a Reply out of time, and plaintiff's response thereto. The Court grants defendant's motion in part but will strike the four affidavits attached to the reply since they were not disclosed during discovery or in defendant's Motion for Summary Judgment. "It is well established that this court will not entertain arguments raised for the first time in a party's reply brief." *Cronin v. F.A.A.*, 73 F.3d 1126, 1134 (D.C. Cir. 1996). The same principle applies to newly proffered evidence attached to a reply brief.

nonetheless failed to satisfy his burden of establishing a genuine issue for trial and, therefore, the Court will grant defendant's motion.

## BACKGROUND

Plaintiff, an African American, served as the Director of Superfund/RCRA, Regional Procurement Operations Divisions ("SRRPOD"), Office of Acquisition Management ("OAM"), Office of Administration and Resources Management ("OARM") from February 1998 to August 2002. This was a position in EPA's Senior Executive Service ("SES"), a special class of employees established by federal statute.[2] *See* 5 U.S.C. § 3131. In June 2000, Judy S. Davis, a white female, became the Acting Director of OAM, and thus, plaintiff's immediate supervisor. (Compl. ¶ 8.) Plaintiff alleges that upon Davis's assumption of her new position, she undermined his authority and deprived him of the ability to do his job because of his race. Plaintiff claims that such treatment included: "(1) overriding his selection of a direct subordinate; (2) arbitrarily cancelling previously approved leave; (3) not selecting him to serve as Acting OAM Deputy Director and selecting lower level white employees instead; (4) ordering him to use PCDOCS, a computer software program, but not ordering similarly situated white employees to do so; (5) preventing him from working on updating and upgrading staff positions within his division; and (6) generally interfering with his management of his division and undermining his authority with his subordinates and others." (Compl. ¶ 9.) These allegedly discriminatory acts took place between June 2000 and April 2002.

---

[2] The SES is "designed to attract and retain highly competent senior executives." 5 U.S.C. § 3131(1). The reassignment procedure for SES members is also established by statute. *Id.* § 3395.

Patterson met several times with Morris Winn, an African American who was the Assistant Administrator of OARM (and Davis' superior), to complain about Davis' management style. (Def.'s Ex. 3 [O'Connor Decl.] ¶ 6.) Around December 2001, plaintiff stated that he could no longer work with Davis and requested to be moved to a comparable position within the SES. (Pl.'s Ex. 16 [Patterson Dep. Day 2] at 18; Def.'s Ex. 6 [Davis Dep. Day 3] at 105; Pl.'s Ex. 20 [Winn Dep.] at 50, 103.) He continued to complain to Winn in early 2002 about his relationship with Davis, forwarding him a draft of his equal employment opportunity ("EEO") complaint on January 4, 2002. (Winn Dep. at 47-51, 93; Pl.'s Ex. 8.) Plaintiff contacted an EEO counselor on February 28, 2002 and filed several complaints of discrimination with the EEO office. (Lafone Decl. (attached to Def.'s Exs.) ¶ 4.) He filed his first formal complaint on April 4, 2002 and his second on July 3, 2002. (*Id.*)

On July 27, 2002, Winn reassigned plaintiff to serve as the Associate Director for Competition and Strategic Planning, Office of Grants and Debarment ("OGD"), another section within OARM.[3] (Winn Dep. at 78-80.) According to defendant, the reassignment was part of EPA's SES "mobility initiative" and in response to Patterson's own request for a transfer. The mobility initiative aimed to move senior executives across various positions and different offices within EPA to "better enable EPA to deal with cross-agency and integrated environmental issues, as well as enhance the career development of SES members." (Mot. at 33; *see* O'Connor Decl. ¶ 5; *see also* Def.'s Ex. 9 [Turner Decl.] ¶¶ 2-3.)

---

[3] The position description establishing the new position was signed on July 3, 2002, and Patterson's transfer was effective August 1, 2002. (Winn Dep. at 69.)

According to David O'Connor, Winn's Deputy Assistant Administrator in 2002, he and Winn worked to "locate and identify an appropriate position" for plaintiff's reassignment. (*Id.* ¶ 6.) This effort coincided with a growing concern within the agency, the General Accounting Office, and Congress about EPA's management of grants, particularly with respect to the competitiveness of the grants process. (*See id.* ¶¶ 7-11; *id*, Ex. 6 [Office of Inspector General Audit Report].) In 2002, EPA issued a new statement of policy, known as EPA Order 5700.5, which formally expressed its intent to promote competition in the assignment of grants. The Order indicated that a new Grants Competition Advocate within OGD would be responsible for overseeing the implementation of the new policy. (*Id.* ¶ 11.) Following this order, OGD established the position of Associate Director, Competition and Strategic Planning. (*Id.* ¶ 12.) Among other responsibilities, the Associate Director would serve as the Grants Competition Advocate. (*Id.*) Winn and O'Connor concluded that "[g]iven Mr. Patterson's expressed desire to move outside of OAM, the concerns about EPA's grants management program, and the establishment of the Associate Director position in OGD in response to those concerns, . . . Mr. Patterson would be a great fit for the position and that the position would be a very good opportunity for him and the Agency." (*Id.* ¶ 12.) According to O'Connor, he and Winn believed that Patterson's experience with the statutory and regulatory requirements for competition in the contracting field made him particularly qualified to improve competition on the grants management side. (*Id.*)

Plaintiff continued at the same grade level and pay in his position within OGD, but claims that the new job carried substantially fewer responsibilities and was no more than a "glorified GS-12 position" (Opp'n at 1), which defendant disputes. Plaintiff also asserts that he was only

one of two SES employees in OARM who were transferred as part of the mobility initiative and that he was the only one who was involuntarily transferred. (*Id.* at 20.)

Following this transfer, plaintiff filed a complaint with this Court on November 8, 2002, claiming discrimination and retaliation under Title VII. (Compl. ¶¶ 13,15.)

**ANALYSIS**

**I.     Legal Standard**

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255; *see also Wash. Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her

obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, 1998 WL 164780, at *3 (D.D.C. March 31, 1998) (internal citation omitted), *aff'd*, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000).

To decide a summary judgment motion in a discrimination case, the Court applies the *McDonnell Douglas* three-part "shifting burdens" test. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff has the initial burden of proving a prima facie case of discrimination. *Id.* at 802. To do so, plaintiff must establish: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999). If he succeeds, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for its actions. *Id.* Its burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). If defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted). At that point, plaintiff has the burden of persuasion to show that defendant's proffered nondiscriminatory reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256; *see also Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) ("[a]lthough the *McDonnell Douglas* framework shifts intermediate evidentiary burdens

between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (internal citations and quotation marks omitted). "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination [or retaliation], summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).

**II.     Plaintiff Failed to Timely Exhaust Claims Arising Prior to January 14, 2002**

Before considering whether plaintiff has proven a prima facie case of discrimination, the Court will address defendant's argument, which plaintiff fails to rebut, that the many alleged incidents occurring prior to January 14, 2002 were not timely exhausted and therefore may not serve as a basis for plaintiff's discrimination claim. (*See* Mot. at 41.)

Lodging a timely administrative charge is a prerequisite to filing a Title VII claim in district court. *See Jarrell v. United States Postal Serv.*, 753 F.2d 1088, 1091 (D.C. Cir. 1985). An employee complaining of discrimination must consult an EEO counselor within 45 days of the date of the allegedly discriminatory action to try to informally resolve the matter. *See* 29 C.F.R. § 1614.105(a)(1). Discrimination claims alleging conduct that occurred more than 45 days prior to the initiation of administrative action are generally time-barred in a subsequent court action. *See Valentino v. United States Postal Serv.*, 674 F.2d 56, 65 (D.C. Cir. 1982). These procedural requirements governing plaintiff's right to bring a Title VII claim are not mere technicalities, but "part and parcel of the Congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel 'primary responsibility' for maintaining nondiscrimination in employment." *Kizas v. Webster*, 707 F.2d 524, 544 (D.C. Cir. 1983)

(citations omitted). "Exhaustion is required in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). The deadlines allow an employer to investigate promptly before evidence becomes stale. *See Del. State Coll. v. Ricks*, 449 U.S. 250, 256-57 (1980) (the Title VII administrative filing requirement protects employers from the burden of defending claims that arise from decisions that were made long ago). It is defendant's burden to prove that plaintiff failed to properly exhaust his administrative remedies. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *Brown*, 777 F.2d at 13.

It is undisputed that plaintiff first contacted an EEO counselor on February 28, 2002. (Lafone Decl. ¶ 4.) Consequently, any discrete acts of discrimination that occurred more than 45 days before that date, or prior to January 14, 2002, are time barred. *See* 29 C.F.R. § 1614.105(a)(1). For example, plaintiff complains that in January 2001 Davis overruled his decision to assign a black employee to a position of his choice and that in December 2001 Davis intentionally rescheduled a staff meeting to conflict with two hours of plaintiff's preapproved leave. Plaintiff also claims that Davis would not select him as an Acting Deputy Director in 2000 and chose a number of white males who were plaintiff's subordinates to serve in this position at various times throughout 2000. These events and the others in plaintiff's litany of pre-2002 allegations[4] were not timely exhausted and are therefore not actionable under Title VII.

---

[4] In addition to the above incidents, plaintiff also alleges that Davis discriminated against him when she would not let him remove a certain program from his computer, criticized him for not contributing money for an office party, announced an unscheduled mid-year review in April 2001, and directed him not to upgrade his administrative officer in December 2001. Even if these events were timely exhausted, none amounts to an adverse action.

As defendant correctly argues, plaintiff cannot cure his failure to timely exhaust his complaints about these incidents by sweeping them under the rubric of a hostile work environment claim. In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court recognized that because "[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice[,]'" a plaintiff's claim of hostile work environment will not be time barred if some of the acts fall outside the limitations period "*so long as all acts which constitute the claim are part of the same unlawful employment practice* and at least one act falls within the time period." *Id.* at 117, 122 (emphasis added). Not only does plaintiff fail to allege a hostile working environment in his complaint, but the various incidents in 2000 and 2001 are discrete acts, and not "part of the same unlawful employment practice." *Id.* at 122. Thus, the Court will not allow plaintiff to evade the exhaustion requirements of *Morgan* by virtue of his allegations of more recent discriminatory acts.[5]

Furthermore, even if plaintiff had alleged a hostile work environment claim, which he has not, the alleged incidents in which plaintiff's authority was "undermined" do not rise to the level of a hostile work environment. The kinds of slights experienced by plaintiff do not evidence a "workplace permeated with 'discriminatory intimdation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

---

[5]Nor may plaintiff argue that this case is exempt from *Morgan* on the grounds that these acts constitute "hybrid claims" (*see* Opp'n at 27 n.8), for the law does not recognize such a category of claims.

working environment.'" *Morgan*, 536 U.S. at 116 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

**III.     The Remaining Allegations of Discrimination Are Not Adverse Actions**

The Court now turns to the question of whether any of the alleged acts of discrimination occurrig after January 14, 2002 amounted to an adverse action.  These incidents include: (1) Davis' veto of Patterson's decision to hire additional support staff on February 25, 2002, and subsequent reversal of her veto on February 27, 2002, after discussing the issue with a "non-black" employee; (2) Davis' decision to detail a black employee (Ron Bell) out of SRRPOD, over Patterson's objection, on February 26, 2002; (3) Davis' decision to detail Barbara Stearrett, another of Patterson's subordinates, out of SRRPOD in March 2002; (4) Davis' decision to fill a vacant position that Patterson had chosen not to fill, and to subsequently detail the new employee out of SRRPOD; (5) Davis' appointment of a white employee at the GS-15 level to serve as Acting Deputy on March 8, 2002; and (6) Davis' rejection on April 3, 2002 of Patterson's proposal that the Office of the Inspector General investigate a white employee's possible theft of a black employee's property, and her subsequent transfer of the black employee out of SRRPOD in April 2002.

To establish an adverse personnel action in the absence of diminution of pay or benefits, plaintiff must show an action with "materially adverse consequences affecting the terms, conditions, or privileges of [his] employment." *Brody*, 199 F.3d at 457.  An "employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker v. WMATA*, 102 F. Supp. 2d 24, 29 (D.D.C. 2000) (citation omitted); *see also Burlington*

*Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

Plaintiff argues that his "ability . . . to direct and manage his employees" is a "term, condition, or privilege of employment," and that by interfering with this ability, Davis' decisions had materially adverse consequences. (Opp'n at 27-28.) He points to his position description, which states that, "as assigned," the Director of SRRPOD "[e]xercises supervisory personnel management responsibilities over staff members, making assignments and determining responsibilities and priorities, evaluating employee performance, recommending appropriate incentives, initiating corrective actions." (Pl.'s Ex. 24 at 653.) While plaintiff is correct that curtailment of supervisory responsibilities may in some circumstances be an adverse action, *see, e.g.*, *Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002), plaintiff has not shown that his supervisory responsibilities were actually curtailed in a "materially adverse" way. *Brody*, 199 F.3d at 457. In fact, plaintiff's complaints regarding his treatment by his supervisor closely resemble those rejected by the D.C. Circuit in *Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002). There, an employee of the Federal Deposit Insurance Corporation complained that, subsequent to a reorganization, his supervisor "made personnel decisions about Forkkio's staff without consulting him (e.g., transferring members of Forkkio's section to other work groups, posting a vacancy for a job opening in his section, and re-interviewing candidates Forkkio had already interviewed)" and "discussed the functions of Forkkio's section with a member of Forkkio's staff instead of with him." *Id.* at 1130. Considering these allegations, among others,

the Court of Appeals found that there was "simply no evidence that after the reorganization plaintiff was somehow hampered in his ability to do his job." *Id.* at 1131. It therefore held that these incidents failed to demonstrate "any adverse consequence to his position or future career." *Id.*

Similarly, Davis' decisions to detail several employees out of Patterson's section and to reject Patterson's proposal for handling a disciplinary issue do not rise to the level of a material adverse change in Patterson's working conditions, even when considered in aggregate. Rather, they are akin to the personnel actions claimed to "undermine [the plaintiff's] authority" in *Forkkio*, which were found to be insufficient to sustain a finding of an adverse action. *Id.* at 1132. Davis was, after all, Patterson's supervisor and the Director of OAM. Though Patterson's position description included the duty to "make assignments," and "initiat[e] corrective actions," the terms of his job did not include sole decisionmaking power over SRRPOD staff. (Pl.'s Ex. 24 at 653.) The position description states that Patterson's supervisory duties were "as assigned," and that he was under the general direction of the OAM Director. (*Id*. at 651-53.) Therefore, even if Davis' micro-management of his section created an unpleasant working environment for Patterson, such a situation is simply not actionable under Title VII. *Forkkio*, 306 F.3d at 1130; *see Burton v. Batista*, 339 F. Supp. 2d 97, 111 (D.D.C. 2004) (being "closely supervised" does not constitute an adverse employment action). Rather, a plaintiff must suffer a "significant change in his job responsibilities," resulting in "objectively tangible harm." *Forkkio*, 306 F.3d at 1131. Plaintiff points to no evidence, other than his own conclusory statement that Davis' actions "created a radical transformation of [his] entire work experience," that he could

not continue to perform his designated responsibilities at SRRPOD.[6/] (Opp'n at 30.) Without any evidence that Davis' conduct in detailing two SRRPOD employees or overruling Patterson's handling of one disciplinary matter actually resulted in "objectively tangible harm," plaintiff cannot succeed in proving a prima facie case of discrimination based on these events.

Nor is Davis' failure to select Patterson as Acting Deputy Director on a single day (March 8, 2002) when both she and the Acting Deputy Director were out of the office an adverse action. The D.C. Circuit has held that this type of temporary designation is not one of the terms, conditions, or privileges of employment. *Taylor v. F.D.I.C.*, 132 F.3d 753, 764 (D.C. Cir. 1997) (interpreting identical language in a Whistleblower Act in light of Title VII precedent). To raise the denial of an appointment above a "minor" action, the denial must have an "immediate effect upon employment conditions." *Taylor*, 132 F.3d at 764 (quoting *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc)). And, since plaintiff has failed to make a "clear showing" that he suffered tangible economic harm from his not being appointed Acting Deputy Director, he cannot establish his claim of discrimination. *Brody*, 199 F.3d at 456.

Plaintiff's other claims of discriminatory acts (*i.e.*, Davis' February 2002 decision not to hire support staff, and subsequent reversal of that decision, and her March 2002 hiring of an employee Patterson chose not to hire, and subsequent reassignment of that employee) border on the nonsensical. The Court fails to see how a decision that was later reversed could have any objectively adverse effect on plaintiff. Similarly, if plaintiff chose not to fill a vacancy for his department, it seems illogical to complain when the vacancy is filled and the chosen employee

---

[6/]A fellow SRRPOD employee states that she "did wonder how the division could continue to deliver high quality work if employees continued to be moved out of the division without replacements," but this does not suffice. (Pl.'s Ex. 14 [Senzel Decl.] ¶ 9.)

(whom plaintiff apparently did not want as a subordinate) is then transferred out of his department. While Patterson may have felt slighted by the fact that Davis apparently did not respect his opinion on these matters, this subjective concern is not a basis for a discrimination claim in the absence of any tangible change in job responsibilities or benefits, for "[n]ot everything that makes an employee unhappy is an actionable adverse action." *Jones v. Billington*, 12 F. Supp. 2d 1, 13 (D.D.C. 1997) (internal citations and quotation marks omitted). Whether Davis' various decisions are considered as discrete acts or in the aggregate, they do not amount to an adverse action within the meaning of Title VII. Therefore, plaintiff has failed to demonstrate a prima facie case and summary judgment will be granted in favor of defendant on Count I.

**IV.     Retaliation**

Plaintiff also claims that Winn's decision to reassign him to the position of Associate Director, Competition and Strategic Planning, OGD (*see* Pl.'s Ex. 13 [Request for Personnel Action]) was in retaliation for Patterson's filing of an EEO complaint against Davis. (Opp'n at 21-26.) To establish a *prima facie* case of retaliation, plaintiff must demonstrate that: (1) he engaged in a statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two. *Brody*, 199 F.3d at 452. Where an employer knew of the employee's protected activity, "very close" temporal proximity between the protected activity and an adverse action suffices to show a causal connection between the two. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing with approval cases finding temporal proximity of four and three months insufficient to demonstrate a causal connection); *see Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000); *Broderick v. Donaldson*,

338 F. Supp. 2d 30, 43 (D.D.C. 2004).  Once the requisite prima facie showing has been made, the same burden shifting analysis used for discrimination claims applies.  *See Cones*, 199 F.3d 520-21.

While there can be no dispute that plaintiff engaged in statutorily protected activity by filing an EEO complaint, the parties debate whether the lateral transfer to OGD was an "adverse action."  Plaintiff describes the position as a sham, and points to the reduction in the number of employees under his supervision and the lack of support staff, while defendant argues that the position "entailed high-level responsibilities of great concern" to EPA and that number of employees supervised should not be the only metric for determining whether plaintiff suffered a substantial reduction in job responsibilities.  (Mot. at 31; Opp'n at 19, 22.)  The parties are also in disagreement over the causation prong.  Plaintiff argues that because Winn "ordered" plaintiff's transfer the day after receiving the EEO officer's letter of acknowledgment of plaintiff's complaint (Opp'n at 18), he has proven a causal link between the reassignment and his protected activity.  (*Id*. at 23-24.)  Defendant responds that plaintiff's reassignment was in the works long before Winn received the EEO complaint, and therefore, plaintiff cannot show causation.  (Reply at 12-13.)  The Court need not resolve these disputes because even if plaintiff has established a prima facie case, he has not rebutted defendant's legitimate, nondiscriminatory reasons for the lateral transfer.  Thus, he has failed to meet his burden under the third step of the *McDonnell Douglas* framework.

Once a plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the personnel action.  As set forth above, defendant produced ample evidence to establish that plaintiff himself requested to be

transferred and that reassignments are to be expected as part of one's service in the SES. (*See, e.g.*, Patterson Dep. Day 2 at 18 (stating willingness to transfer to comparable position); Davis Dep. Day 3 at 86 (recalling that Patterson told Winn he wanted to move); Winn Dep. at 109 ("I have a very clear sense that Pat on maybe one or two occasions said that 'I really need to be relocated somewhere else.'"); O'Connor Decl., Ex. 1 (Memorandum announcing SES Mobility Program).) Plaintiff agrees that "these facts might explain why Patterson was moved," but argues that they nevertheless fail to justify why Patterson had to be moved to position which, in his view, carried fewer responsibilities. (Opp'n at 24.) However, defendant has also explained that a "crescendo of concerns" about EPA's grant programs led to the establishment of the Associate Direct for OGD position (Reply at 13; *see, e.g.*, O'Connor Decl., Ex. 6 [Office of Inspector General Audit Report]), and that plaintiff's supervisors considered Patterson uniquely qualified for this position. (O'Connor Decl. ¶ 13.) This legitimate rationale for plaintiff's particular assignment-- and defendant's belief that the position entailed significant responsibilities-- is fully supported by the record. In Winn's correspondence with the Office of Management and Budget on August 1, 2002, he specifically touted plaintiff's "extensive experience in the competition process for federal contracts." (*Id.*, Ex. 10 at 1.) Again, in his testimony before Congress on June 11, 2003, Winn cited his appointment of Patterson as evidence of EPA's efforts to improve grant management. (*Id.*, Ex. 11 at 4.) He also noted that Patterson would have "broad authority to issue interpretive guidance, approve program-specific procedures and specified exemptions, resolve disagreements between program and grants management offices, and intervene in solicitation processes if necessary." (*Id.*)

As defendant has met its burden of putting forth a legitimate rationale for transferring Patterson to the Associate Director position, it falls to plaintiff to "adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext" for retaliation. *Paquin*, 119 F.3d at 27-28; *see McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984) ("The *McDonnell Douglas* framework is also applicable to claims of [a] retaliatory [adverse action].")  In attempting to do so, plaintiff asserts that he was one of only two OARM SES employees who were moved as part of the mobility initiative and that the other employee, a white female named Daiva Balkus, was permitted to transfer to a position of her choice. (Opp'n at 24-25.)  Patterson, on the other hand, was "less than thrilled" about the move to OGD (Winn Dep. at 71-72), and had advised Winn in early 2002 that if his requested transfers were not available, he "would prefer to maintain [his] current position." (Pl.'s Ex. 6 [Note from Plaintiff to Morris Winn dated Feb. 2, 2002].)  Thus, he contends that defendant's claim that Patterson's transfer was part of the mobility initiative and in response to plaintiff's own request cannot be believed.

Plaintiff's arguments do not withstand scrutiny.  First, the record does not show that plaintiff was singled out for a transfer.  To support his claim that only two OARM SES employees were transferred, plaintiff points only to his own deposition where he "hazard[s] a guess that less than 3 to 5 percent of SESs moved." (Patterson Dep. Day 2 at 28.)  A guess is not sufficient to raise an issue for trial.   Moreover, the record shows that EPA effected mobility transfers for a large number SES employees (*see* O'Connor Decl., Ex 4 (announcing 21 new SES mobility assignments on March 28, 2002, five additional SES moves on May 28, 2002 , and eight on July 16, 2002) and that at least three other SES employees in OARM were transferred.  (*See*

- 17 -

*id.* (noting new assignments for Balkus, Jane Moore, and Rich Lemley).) Thus, plaintiff has failed to rebut defendant's claim that transfers were a normal, well-known feature of any SES position.

Plaintiff also fails to support his assertion that his transfer was unique in that it was the only involuntary transfer in OARM. While he refers to two pages in Winn's deposition, this record cite does not support his claim. There, Winn's answer to the question of whether he "compel[led] [Balkus] to go," was that he could not recall. (Winn Dep. at 20.) He then stated that he thought the decision was "probably" taken at his "instance." (*Id.*) If anything, this testimony suggests that Balkus' transfer was *not* voluntary.[7] It certainly does not give rise to an inference that Patterson was treated differently from SES employees who had not filed discrimination complaints. Nor does plaintiff offer evidence to show that Moore and Lemley's transfers were voluntary. Plaintiff's argument is also at odds with the fact that involuntary transfers are explicitly contemplated by statute. (Turner Decl. ¶ 2 (the "head of an agency" is enabled by statute "to reassign senior executives to best accomplish the agency's mission") (quoting 5 U.S.C. § 3131(5)).)

Plaintiff does not even attempt to rebut defendant's third legitimate reason for transferring plaintiff-- the need for someone with Patterson's qualifications to fill the newly created Associate Director position in OGD.

---

[7] In his deposition, plaintiff alludes to another SES employee who was adamant about not moving, but whose position was nevertheless advertised as one to which others in the SES could move. (Patterson Dep. Day 2 at 29.) This anecdote suggests that involuntary moves were not as uncommon as plaintiff would like the Court to believe.

In short, plaintiff's efforts to characterize Winn's actions as retaliatory are insufficient to create any triable issue of fact. Plaintiff cannot show that defendant's explanation that Winn aimed to address a major personality conflict, mobilize SES workers, and fill a vacant position by transferring plaintiff "is a phony reason" for his transfer. *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Plaintiff's speculations as to Winn's purpose do not raise a genuine issue of material fact and he has offered little else from which to infer retaliatory animus. *Brody*, 199 F.3d at 459 (citing *Branson v. Price River Coal Co.* 853 F.2d 768, 772 (10th Cir. 1988)) (mere speculation insufficient to avoid summary judgment). Finally, the well-publicized fact of plaintiff's reassignment further discredits plaintiff's theory that Winn created the position merely as a way to downgrade Patterson's position in the agency in response to Patterson's EEO complaint. By touting the appointment of Patterson as one way to improve EPA's much-criticized grants program, Winn assured that the position would be one of high visibility. His pronouncements before Congress and the Office of Management and Budget can hardly be squared with the notion that he aimed to strip the position of responsibility and leave it without resources in retaliation for plaintiff having filed an EEO complaint.

## CONCLUSION

For the reasons stated above, plaintiff cannot establish a claim of race discrimination or retaliation under Title VII. Accordingly, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed with prejudice. A separate Order accompanies this Memorandum Opinion.

                                                                      s/
_____ELLEN SEGAL HUVELLE
                                                   United States District Judge

Date:   September 26, 2005